# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Graystone Academy Charter School, : 
                   Petitioner : 
 : 
 : 
         v. : 
 : 
 : 
Coatesville Area School District, :    No. 1336 C.D. 2013
                 Respondent : 
 : 
Coatesville Area School District, : 
                 Petitioner : 
 : 
 : 
         v. : 
 : 
 : 
Graystone Academy Charter School, :    No. 1402 C.D. 2013
                 Respondent :    Argued: June 20, 2014


BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
               HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE ANNE E. COVEY, Judge


OPINION BY
JUDGE COVEY               FILED: August 27, 2014


        Graystone Academy Charter School (Charter School) petitions this Court for review of the State Charter School Appeal Board's (CAB) August 2, 2013 order affirming the Coatesville Area School District's (District) Board of Directors' (Board) decision to revoke the Charter School's charter. The District cross-petitions this Court for review of CAB's June 18, 2012 order dismissing its motion to quash the Charter School's appeal to CAB as untimely. There are nine issues before the Court: (1) whether CAB committed an error of law in dismissing the District's motion to quash; (2) whether William Harner (Harner), the Secretary of Education (Secretary) nominee, had the authority to call to order, preside over and/or participate in the CAB meeting during which CAB voted to revoke the Charter School's charter

and to execute an order memorializing CAB's decision; (3) whether the District is estopped from challenging the Charter School's changes to the Charter School's education program; (4) whether CAB and the District erred when they determined that the Charter School's charter includes by incorporation the Charter School application (Charter Application); (5) whether CAB and the District erred when they determined that the Charter School materially deviated from its charter; (6) whether CAB and the District erred when they determined that the Charter School failed to meet the student performance requirements; (7) whether the Charter School suffered disparate treatment; (8) whether CAB and the District erred when they determined that the Charter School failed to meet generally-accepted standards of fiscal management; and (9) whether CAB and the District violated the Charter School's due process rights.

## Background

In 2000, the District issued a three-year charter to the Charter School pursuant to the Charter School Law (CSL).[1] The District subsequently voted to extend the charter two years and, in 2006, the District renewed the Charter School's charter for another five years, starting July 1, 2007. In 2011, after the Charter School prematurely sought to renew its charter, the District initiated a comprehensive five-year review. Since the charter would not lapse until 2012, and the District wished to terminate the charter prior to that date, it issued a Notice of Revocation to the Charter School on March 16, 2011. The Notice of Revocation set forth five revocation grounds with each containing multiple reasons. The five categories were: material violations of the charter; failure to meet student performance standards; failure to meet standards of fiscal management; failure to provide the District certain reports and records; and, violations of law.

---

[1] Act of March 10, 1949, P.L. 30, *as amended,* added by Section 1 of the Act of June 19, 1997, P.L. 225, 24 P.S. §§ 17-1701-A - 17-1751-A.

The Board appointed hearing officer James E. Prendergast (Prendergast) to preside over the revocation proceedings which consisted of thirteen days of hearings. On November 22, 2011, after receiving public comment, the Board voted unanimously to revoke the Charter School's charter. The Charter School appealed to CAB on January 24, 2012, and the District filed a motion to quash the appeal. On June 18, 2012, CAB dismissed the District's motion to quash. On August 2, 2013, CAB issued its adjudication, concluding that the evidence supported revoking the Charter School's charter on three separate grounds: (1) material charter violations; (2) failure to meet student performance standards; and (3) failure to timely submit audit reports. On August 7, 2013, the Charter School filed a petition for review and motion for stay with this Court. By August 15, 2013 order, this Court denied the Charter School's motion for stay. On August 20, 2013, the District filed a cross-petition for review.[2] On September 16, 2013, the Charter School filed a petition for review with the Pennsylvania Supreme Court to overturn this Court's denial of its motion for stay. By October 11, 2013 order, our Supreme Court denied the Charter School's petition for review.

## Motion to Quash

The District's cross-petition contains a threshold issue which we will address first.[3] The District argues that CAB committed an error of law in dismissing

---

[2] "Our scope of review of an order of [CAB] is limited to a determination of whether constitutional rights were violated, errors of law committed or whether the decision is not supported by substantial evidence." *Cmty. Serv. Leadership Dev. Charter Sch. v. Pittsburgh Sch. Dist.*, 34 A.3d 919, 924 n.7 (Pa. Cmwlth. 2012).

[3] The District does not technically have standing to challenge CAB's order because the District was not aggrieved. However, the District is asserting alternative grounds for affirming CAB's order, i.e., CAB erred in addressing the merits of the Charter School's appeal because it lacked jurisdiction based on the Charter School's untimely appeal. This issue is acceptable. *See Keebler v. Zoning Board of Adjustment of City of Pittsburgh*, 998 A.2d 670 (Pa. Cmwlth. 2010). Thus, although improperly raised as a cross-appeal, we will address the District's issue concerning its motion to quash.

the District's motion to quash because the Charter School did not appeal from the Board's revocation of its charter to CAB for 63 days.[4]

Although the Board voted to revoke the Charter School's charter on November 22, 2011, the District did not send the Charter School a copy of the decision and order until December 7, 2011.[5] The Charter School received the Board's decision and order on December 9, 2011, and filed its appeal therefrom on January 24, 2012, 44 days thereafter.[6]

In dismissing the District's motion, CAB stated in its decision: "The [CSL] is silent on this issue, and CAB has not by way of regulation, informal guidance or through its decisions clearly established the time within which the appeal of a decision to revoke or non-renew a charter must be filed." CAB June 18, 2012 Dec. (CAB(1) Dec.) at 2. CAB specifically held: "[W]e have not set a specific appeal time from decisions to revoke or non[-]renew charters. Having not done so, we will

---

[4] The Board voted to revoke the charter on November 22, 2011 and the Charter School appealed to CAB on January 24, 2012.

[5] The District sent the Board's decision and order by certified mail.

[6] The District maintains that the Charter School had notice earlier because "the Charter School's Solicitor received service of the Findings of Fact and Conclusions of Law and Order **as an attachment** to a filing in a federal court proceeding involving the Parties, and the Findings of Fact and Conclusions of Law were posted to [the District's] website **for public view**." District First Br. at 38 (emphasis added). However, neither of the above publications can be construed as effective service of the Board's decision and order on the Charter School. Moreover,

> where the appeal period is triggered by administrative action, the involved administrative agency has a duty to provide to the recipient information essential to calculating the appeal period. Without such information, the recipient has no reliable basis for knowing the number of days remaining in which to file a petition for review. Where the agency's notice is defective in this regard, we will not dismiss an appeal for untimeliness.

*Julia Ribaudo Senior Servs. v. Dep't of Pub. Welfare*, 969 A.2d 1184, 1188-89 (Pa. 2009) (citations omitted).

not penalize [the Charter School] for an appeal filed 46[7] days after [the Board's] decision." *Id.* at 4.

The District maintains that *Germantown Settlement Charter School v. Philadelphia School District* (CAB 2008-06) (*Germantown*), controls the outcome here, and requires that an appeal be filed within 30 days of the revocation decision. However*,* in *Germantown*, CAB erroneously relied on Section 5571 of the Judicial Code, which directs:

> **(a) General rule.--**The time for filing an appeal, a petition for allowance of appeal, a petition for permission to appeal or a petition for review of a quasi-judicial order, **in the Supreme Court, the Superior Court or the Commonwealth Court shall be governed by general rules.** No other provision of this subchapter shall be applicable to matters subject to this subsection.
>
> **(b) Other courts.--**Except as otherwise provided in subsections (a) and (c) and in [S]ection 5571.1 (relating to appeals from ordinances, resolutions, maps, etc.), an appeal from a tribunal or other government unit **to a court or from a court to an appellate court must be commenced within 30 days after the entry of the order** from which the appeal is taken, in the case of an interlocutory or final order.

42 Pa.C.S. § 5571 (emphasis added). Because the Charter School appealed from the Board to CAB, not "to a court or from a court," Section 5571 of the Judicial Code does not control in the instant action. Further, in *Germantown*, CAB specifically held as a Conclusion of Law that "CAB acted within its **discretionary authority** when it granted the Motion to Quash." *Germantown*, Slip Op. at 3, Conclusion of Law (COL) 6 (emphasis added). Moreover, although CAB found the appeal in *Germantown* untimely, it decided the appeal in *In Re: Wonderland Charter School* (CAB 2002-07), wherein, the appeal was filed over 30 days after the district denied

---

[7] CAB refers to 46 days rather than 44 days because it used the mailing date of December 7, 2011, as opposed to the date of receipt which was December 9, 2011. *See* CAB(1) Dec. at 2.

the charter school's renewal. S*ee also In Re: Ronald H. Brown Charter School* (CAB 2005-08) (appeal decided although filed beyond 30 days). Thus, *Germantown* is not dispositive.

The Charter School contends CAB's website establishes that the time for appeal is 60 days; however, the website does not so state. Rather, CAB's website refers to the 60 day time period for gathering signatures to appeal from a denial of an original charter school application or a resubmitted application. *See* Reproduced Record (R.R.) at 250a. Thus, CAB's website is not dispositive.

> Pursuant to Section 1721-A(b) of the CSL, CAB
>
> shall meet as needed to fulfill the purposes provided in this subsection. A majority of the members of [CAB] shall constitute a quorum, and a majority of the members of [CAB] shall have authority to act upon any matter properly before [CAB]. **[CAB] is authorized to establish rules for its operation.**

24 P.S. § 17-1721-A(b) (emphasis added). Further,

> [w]ell-settled precedent establishes that courts defer to an administrative agency's interpretation of its own regulations unless that interpretation is unreasonable. The task of the reviewing court is limited to determining whether the agency's interpretation is consistent with the regulation and with the statute under which the regulation was promulgated. **The United States Supreme Court has referred to this deference as the interpretive lawmaking power of administrative agencies and has characterized it as a 'necessary adjunct' of the authority to promulgate and enforce regulations.**

*Marshall v. Commonwealth*, 41 A.3d 67, 77 (Pa. Cmwlth. 2012) (emphasis added) (quoting *Dep't of Envtl. Prot. v. N. Am. Refractories Co.,* 791 A.2d 461, 464–65 (Pa. Cmwlth. 2002) (citations omitted)). Here, CAB never established rules denoting the time period from which to appeal a local school district board's decision to revoke or non-renew charters to CAB. While reluctant to leave the time for appeal open-ended,

6

this Court will not usurp CAB's authority by specifying the appeal period. Accordingly, CAB's order denying the District's motion to quash is affirmed.

This Court acknowledges the continued confusion that will persist in the absence of a rule establishing an appeal time period from a local school district board's decision to revoke or non-renew charters to CAB. The inconsistency of CAB's prior decisions on this issue demands that CAB use the authority bestowed upon it through Section 1721-A(b) of the CSL to set forth the number of days for which an appeal must be commenced. Thus, we strongly urge CAB to promulgate and steadfastly enforce such a rule.

### Authority of Department of Education Secretary Nominee

Having disposed of the issue raised in the District's cross-petition, we will now address the Charter School's issues. The Charter School first argues that Harner did not have the authority, absent confirmation by the Pennsylvania Senate, to call to order, preside over and/or participate in the CAB meeting during which CAB revoked the Charter School's charter and executed the order memorializing CAB's decision. However, as nominee to fill the vacancy in the Secretary of Education position, Harner was Acting Secretary for the Department of Education[8] at all relevant times during the proceeding before CAB involving this case. Harner withdrew his nomination on August 27, 2013, before being confirmed by the

---

[8] Harner was appointed Acting Secretary of Education effective June 3, 2013, when then Secretary of Education Ronald Tomalis left the Department in May 2013 to become an advisor to Pennsylvania Governor Tom Corbett on higher education. Specifically, "Harner was nominated by the Governor of the Commonwealth of Pennsylvania to fill the vacancy in the position of Secretary of Education on May 22, 2013." Charter School First Br. at 29. This Court takes judicial notice of the July 26, 2013 letter from Governor Tom Corbett to "Acting Secretary" Harner which reads as follows: "I am pleased to appoint you as Chairman of [CAB], effective immediately. Please accept my best wishes for success in your new responsibilities and appreciation for your dedicated service to the Commonwealth." District Second Br., Appendix A.

7

Pennsylvania Senate which date was after the order issued and appealed from in the instant matter.

The District retorts that the Charter School waived this issue because although it could not be raised below since Harner did not withdraw his name for consideration until August 27, 2013, the Charter School had 30 days from CAB's August 2, 2013 order to amend its petition for review to include this issue. On August 26, 2013, the Charter School moved to amend its petition for review to include three additional issues which this Court granted. The Charter School's Motion to Amend its Petition for Review did not include this issue. On September 17, 2013, the Charter School filed a Second Motion to Amend its Petition for Review to include this issue which this Court denied because it was beyond the 30 days. *See* Commonwealth Ct. September 26, 2013 Order (September 26, 2013 Order).

It is undisputed that the Charter School "failed to preserve this issue in [its] petition for review and, thus, it is waived. *See Pa. State Troopers Ass'n v. Pa. Labor Relations Bd.,* 39 A.3d 616, 622 (Pa.[]Cmwlth.[]2012) ('Issues not raised or 'fairly comprised' within the petition for review are deemed waived.'); Pa. R.A.P. 1513(d)." *Fisler v. State Sys. of Higher Educ., Cal. Univ. of Pa.*, 78 A.3d 30, 46 (Pa. Cmwlth. 2013). Further, by September 26, 2013 Order, this Court specifically denied the Charter School's Second Motion to Amend its Petition for Review because a "petitioner may not amend his petition for review beyond the 30-day filing period in order to raise new issues." *Edwards v. Unemployment Comp. Bd. of Review*, 3 A.3d 690, 693-94 (Pa. Cmwlth. 2010).

The Charter School acknowledges that this issue was not included in its Petition for Review or its Amended Petition for Review and that this Court denied its Second Motion to Amend its Petition for Review to include this issue due to timeliness. However, the Charter School asserts in its brief that it included the issue nonetheless because it goes directly to this Court's jurisdiction to decide the case.

8

The Charter School maintains that since Harner was without the authority to participate in the meeting at which CAB revoked the Charter School's charter or execute the order in question, the order is void ab initio and consequently there exists no order from which an appeal can be taken to this Court. *See* Charter School First Br. at 26.

> Under the *de facto* doctrine, the official acts of one who acts under the color of title to an office are to be given the same effect as those of a *de jure* official. The acts of *de facto* officials that are performed under the color of title are valid with regard to the public, even if their election or appointment was irregular or illegal.

*Ucheomumu v. Cnty. of Allegheny*, 729 A.2d 132, 135 (Pa. Cmwlth. 1999) (citation omitted). Thus, notwithstanding Harner's subsequent withdrawal of his nomination, he had the authority as Acting[9] Secretary to call to order, preside over and participate in the meeting of CAB during which CAB revoked the Charter School's charter and executed the order memorializing its decision.

### Estoppel

The Charter School next asserts that the District is estopped from challenging changes to the Charter School's education program where the Charter School provided notice to the District of the changes, the District failed to object, and the Charter School continued to operate under its reasonable interpretation of the charter in reliance on the District's inaction. The District responds that the Charter School's estoppel issue was never raised before CAB.

The law is well-settled that issues not raised in the lower tribunal are waived and cannot be raised for the first time on appeal. *Schmidt v. Boardman Co.*, 11 A.3d 924 (Pa. 2011). At the outset, there is "no indication that this [estoppel]

---

[9] *Black's Law Dictionary* 29 (9th Ed. 2009), defines "acting" as: "Holding an interim position; serving temporarily[.]"

issue was presented to [CAB], and [the Charter School] has failed to direct us to any portion of the record that would show otherwise. Therefore, this issue has been waived." *Commonwealth v. Spotz*, 18 A.3d 244, 275 n.17 (Pa. 2011). Notwithstanding, "[t]he essential elements of estoppel are an inducement by the party sought to be estopped to the party who asserts the estoppel to believe certain facts to exist-and the party asserting the estoppel acts in reliance on that belief." *Ward v. Dep't of Transp., Bureau of Motor Vehicles*, 65 A.3d 1078, 1084 (Pa. Cmwlth. 2013) (quoting *Westinghouse Elec. Corp./CBS v. Workers' Comp. Appeal Bd. (Korach)*, 883 A.2d 579, 586 (Pa. 2005) (internal quotation marks omitted)).

The Charter School contends that many of the charter violations that formed the basis of the revocation were in existence before the Charter School's attempted renewal in 2011, and the Board should have been aware of them when the Charter School's charter was renewed in September 2006.[10] For example, the

---

[10] Section 1728-A(a) of the CSL specifically provides that "[t]he local board of school directors shall annually assess whether each charter school is meeting the goals of its charter and **shall conduct a comprehensive review prior to granting a five (5)[-]year renewal of the charter**." 24 P.S. § 17-1728-A(a) (emphasis added). Further, Section 1729-A of the CSL states in relevant part:

> (a) During the term of the charter or at the end of the term of the charter, the local board of school directors may choose to **revoke** or not to renew the charter based **on any of the following**:

> (1) One or more material violations of any of the conditions, standards or procedures contained in the written charter signed pursuant to [S]ection 1720-A.

> (2) Failure to meet the requirements for student performance set forth in 22 Pa. Code Ch. 5 (relating to curriculum) or subsequent regulations promulgated to replace 22 Pa.[]Code Ch. 5 or failure to meet any performance standard set forth in the written charter signed pursuant to [S]ection 1716-A.

> (3) Failure to meet generally[-]accepted standards of fiscal management or audit requirements.

Paragon Curriculum had been discontinued at the end of the 2006-2007 school year, a letter regarding reducing the number of instructional days was sent in 2008, the library described in the Charter School's Charter Application never existed, and the annual reports from at least 2004-2005 do not identify primary care teaching or "looping" or performance pay incentive for teachers as part of the Charter School's educational programming. *See* Charter School First Br. at 33, 35, 36, 37, 38. Thus, the Charter School was induced to rely on the fact that the departures from the charter were acceptable.

With the exception of the letter from the Charter School to the District stating "[s]ubject to the approval of the [District]" the Charter School would be reducing its instructional days from 200 to 181, the District had no advance notice regarding the above modifications to the Charter School's charter. R.R. at 1532a. In addition, as stated in CAB's Finding of Fact (FOF) 25,[11] the Charter School "stopped using the Paragon Curriculum at the end of [the] 2005-2006 school year, **but continued to promote [it] as its 'signature curriculum,' in [the Charter School's] Annual Report filed with [Pennsylvania Department of Education (]PDE[)], dated October 9, 2007**." CAB August 2, 2013 Dec. (CAB(2) Dec.) at 7 (emphasis added). Moreover, the letter regarding reducing the number of instructional days was sent in 2008 **but was never approved**, and the District did not learn that the library described in the Charter School's Charter Application never existed until the District conducted its comprehensive review **in 2010**. *See* CAB(2) Dec. at 8, FOF 29-31.

---

(4) Violation of provisions of this article.

24 P.S. § 17-1729-A (emphasis added).

[11] "The [agency's] findings of fact are conclusive on appeal only so long as the record, taken as a whole, contains substantial evidence to support them." *Stage Road Poultry Catchers v. Dep't of Labor and Industry, Office of Unemployment Comp., Tax Services*, 34 A.3d 876, 886 (Pa. Cmwlth. 2011). Here, substantial evidence supports CAB's findings.

Because the District had no prior knowledge of the alterations, the District could not have induced the Charter School to believe or rely on the fact that the changes were acceptable.

> Section 1702-A of the CSL provides in pertinent part:
>
> It is the intent of the General Assembly, in enacting this article, to provide opportunities for teachers, parents, pupils and community members to establish and maintain schools that operate independently from the existing school district structure as a method to accomplish all of the following:
>
> (1) Improve pupil learning.
>
> (2) Increase learning opportunities for all pupils.

24 P.S. § 17-1702-A. Further, Section 1720-A(a) of the CSL establishes that:

> Upon approval of a charter application under [S]ection 1717-A [of the CSL], a written charter shall be developed which shall contain the provisions of the charter application and which shall be signed by the local board of school directors of a school district, by the local boards of school directors of a school district in the case of a regional charter school or by the chairman of the appeal board pursuant to [S]ection 1717-A(i)(5) [of the CSL] and the board of trustees of the charter school. This written charter, when duly signed by the local board of school directors of a school district, or by the local boards of school directors of a school district in the case of a regional charter school, and the charter school's board of trustees, shall act as legal authorization for the establishment of a charter school. **This written charter shall be legally binding on both the local board of school directors of a school district and the charter school's board of trustees.**

24 P.S. § 17-1720-A(a) (emphasis added). In order to change the terms of a charter, a charter school is "required to amend its charter." *Career Connections Charter High Sch. v. Sch. Dist. of Pittsburgh*, 91 A.3d 736, 744 (Pa. Cmwlth. 2014). Moreover, a charter school that changes the terms of the charter "without [amending its charter], is

12

subject to closure under Section 1729–A (a)(1) of the CSL, **regardless of whether the [school d]istrict knew of the changes**." *Id.* (emphasis added).

Here, the record is devoid of evidence that the Charter School and the District amended the Charter School's charter. In fact, the Charter School does not appear to dispute CAB's findings that the Charter School made changes to its charter, rather, it contends that the District knew of the changes and by its inaction implicitly approved the changes. However, that is not the law. Nor is the equitable doctrine of estoppel applicable. "The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy in issue . . . ." *Mazzitti and Sullivan Counseling Servs., Inc. v. Dep't of Pub. Welfare*, 7 A.3d 875, 882 (Pa. Cmwlth. 2010) (footnote omitted) (quoting *Terraciano v. Dep't of Transp., Bureau of Driver Licensing*, 753 A.2d 233, 237-38 (Pa. 2000) (citations omitted)). The law did not allow the Charter School to unilaterally change the charter's terms. Moreover, the Charter School acknowledges in its letter to the District that the change in the number of school days required the District's approval. Notwithstanding this admission, the Charter School reduced the number of school days without authorization. Thus, the Charter School does not have clean hands. Mindful of the Legislature's intent for enacting the CSL - to **"[i]mprove pupil learning"** and **"[i]ncrease learning opportunities for all pupils"** - although the District could possibly have revoked the Charter School's charter sooner as the Charter School **admittedly altered its charter without authorization**, we disagree with the Charter School's position that because the District did not revoke the charter earlier, it cannot do so now. 24 P.S. § 17-1702-A(1), (2) (emphasis added).

**Charter Application Incorporated into the Charter**

The Charter School next contends that CAB and the District erred when they determined that the Charter School's charter includes by incorporation the Charter Application when the express language of the CSL requires the District to

13

develop a written charter that incorporates the terms of the application into the charter. Section 1720-A(a) of the CSL expressly provides that "[u]pon approval of a charter application under [S]ection 1717-A [of the CSL], a written charter shall be developed **which shall contain the provisions of the charter application** . . . ." 24 P.S. § 17-1720-A(a) (emphasis added).[12] As illustrated in *Northside Urban Pathways Charter School v. State Charter School Appeal Board (Northside)*, 56 A.3d 80 (Pa. Cmwlth. 2012), this statutory provision incorporates a charter school's application as a matter of law. The *Northside* Court explained:

> If a charter school states in its charter application that it will be located in a particular building, then that provision becomes part of the school's charter. If the school changes its location during the term of the charter without amending its charter, it is subject to closure under Section 1729-A(a)(1) of the [CSL], 24 P.S. § 17-1729-A(a)(1).

*Id.* at 86.

Here, the Charter School was aware that CAB took the position that the Charter Application was automatically part of the charter and CAB's underlying support therefor because the Charter School had unsuccessfully sought to amend its Charter Application for the purpose of deviating from its charter. Specifically, in its November 10, 2004 letter to the District, the Charter School requested "an amendment to the [Charter Application][,] . . . to add grades 9 and 10 to [its] existing charter application . . . ." R.R. at 1367a; *see also* R.R. at 1532a (Charter School's February 20, 2008 letter to the District requesting change in calendar days).

---

[12] Approval of a charter "is more like the issuance of a regulatory permit where the state or local government must honor the terms of the permit unless breached by the party receiving the permit." *Foreman v. Chester-Upland Sch. Dist.*, 941 A.2d 108, 115 (Pa. Cmwlth. 2008).

In giving due deference to the administrative agency whose responsibility it is to interpret and apply the law it is to administer,[13] we embrace CAB's rationale as the basis for our ruling set forth below. CAB articulately explained:

> [T]he rules of statutory construction require that a statute's language must be read in a sense which harmonizes with the subject matter and its general purpose and object. *Busy Beaver Bldg. Centers, Me. v. Tueehe*, 442 A.2d 252, 256 (Pa. Super[.] 1981). The general purpose and object of the CSL are set forth in section 1702-A, 24 P.S. § 17-1702-A, where the General Assembly outlined its intent in enacting the CSL. Also, in evaluating a charter school application initially, the local board of school directors is to consider criteria including, but not limited to, the criteria set forth in [S]ection 1717-A(e)(2) of the CSL, 24 P.S. § 17-171[7]-A(e)(2), which specifically references, among other things, 'the extent to which the application[]. . . conforms to the legislative intent outlined in section 1702-A.' Section 1717-A(e)(2)(iii), 24 P.S. § 17-1717-A(e)(2)(iii). Given (1) that the legislature established an application process in which the charter school applicant must provide specified information to the chartering district so as to assure that the proposed charter school will, among other things, fulfill the

---

[13] "CAB is the administrative agency charged with exclusive review of an appeal of a local school board decision not to grant a charter application[.]" *McKeesport Area Sch. Dist. v. Propel Charter Sch. McKeesport*, 888 A.2d 912, 916 n.4 (Pa. Cmwlth. 2005); *Souderton Area Sch. Dist. v. Souderton Charter Sch. Collaborative*, 764 A.2d 688, 692 n.8 (Pa. Cmwlth. 2000).

> It is a fundamental principle of administrative law that an administrative agency's interpretation of the statute it is charged to administer is entitled to deference on appellate review absent fraud, bad faith, abuse of discretion, or clearly arbitrary action. Our Supreme Court has stated: It is well settled that when the courts of this Commonwealth are faced with interpreting statutory language, they afford great deference to the interpretation rendered by the administrative agency overseeing the implementation of such legislation.

*Turchi v. Phila. Bd. of License & Inspection Review*, 20 A.3d 586, 591 (Pa. Cmwlth. 2011) (citation and quotation marks omitted).

stated legislative intent of the CSL, and (2) that the charter application is the document by which the charter school applicant persuades the chartering district that the proposed charter school will further that specifically-stated legislative intent, it follows that interpreting the statute to incorporate the charter application into the charter as a matter of law harmonizes with that legislative intent.

Indeed, interpreting the CSL differently could result in an absurd implementation of the CSL in which a chartering district could approve a charter application, but because it neglects to include express incorporation language in the written charter, the charter school could immediately deviate from any of the items set forth in the charter application.

CAB(2) Dec. at 32-33 (footnote omitted). In adopting CAB's rationale, we also accept CAB's holding in its *Fell Charter School* (CAB 2007-04) decision as our ruling herein on this issue:

When a charter is granted by a local board of school directors, the charter school is required to comply with the terms and conditions of that charter, as well as the information contained in the charter school application, which is incorporated into the charter. 24 P.S. § 17-1720-A; *see also* 24 P.S. § 17-1729-A(a)(1).

*Id.* at 7. Accordingly, CAB and the District did not err when they determined that the Charter School's charter included the Charter Application by incorporation.

**Charter School By-Laws**

The Charter School next avers that CAB and the District erred when they determined that the Charter School materially deviated from its charter because the Charter School was specifically permitted by its approved by-laws to make changes to its operations, and the Charter School's Board of Trustees is statutorily responsible for such decisions. Section 1716-A(a) of the CSL provides:

The board of trustees of a charter school shall have the authority to decide matters related to the operation of the

16

school, including, but not limited to, budgeting, curriculum and operating procedures, **subject to the school's charter**. The board shall have the authority to employ, discharge and contract with necessary professional and nonprofessional employe[e]s **subject to the school's charter and the provisions of this article**.

24 P.S. § 17-1716-A(a) (emphasis added).  This Court has held: "A prerequisite to the grant of a charter is the organization of the school as a nonprofit corporation governed by a board of trustees that possesses authority to decide matters relating to the operation of the school, **subject to the school's charter**." *McKeesport Area Sch. Dist. v. Propel Charter Sch. McKeesport*, 888 A.2d 912, 921 (Pa. Cmwlth. 2005) (emphasis added) (quoting *Mosaica Acad. Charter Sch. v. Dep't of Educ.,* 813 A.2d 813, 818 (Pa. 2002) (citing Section 1716-A(a) of the CSL, 24 P.S. § 17-1716-A(a))).  Moreover, the terms listed in the charter application are determined without input of the board of trustees.  *West Chester Area Sch. Dist. v. Collegium Charter Sch.*, 812 A.2d 1172 (Pa. 2002).  Consequently, notwithstanding whether the Charter School was specifically permitted by its approved by-laws to change its operations and/or whether its Board of Trustees are statutorily responsible for such decisions, the Board of Trustees is constrained by the Charter School's charter.  As astutely explained in CAB's decision which we adopt:

> [W]hile a charter school's board of trustees unquestionably possesses the authority to decide matters related to the operation of the school, that authority is subject to the school's charter.  In review then, the chartering district grants the charter based on what is in the charter application.  The contents of the charter application are incorporated by operation of law into the charter.  Any changes to the charter are subject to the approval of the chartering district.  And finally, the chartering school district has accountability over the charter school.
>
> It follows that the charter school's board of trustees may make changes to the charter, but any changes are subject to the approval of the chartering school district, and if changes

17

are made without amending the charter, the charter school is subject to closure under [S]ection 1729-A(a)(1) of the CSL, 24 P.S. § 17-1729-A(a)(1). Therefore, [the Charter School] does not, as it argues, have unfettered authority to make changes to its operations if those changes require deviation from the charter and the charter application incorporated into the charter by operation of law.

CAB(2) Dec. at 36-37 (citations omitted). Thus, we hold that any unilateral change the Board of Trustees made to the Charter School's operations not in accordance with the charter or the Charter Application which is incorporated into the charter as a matter of law constituted a deviation from the charter. Accordingly, CAB and the District did not err when they determined that the Charter School materially deviated from its charter.

## Student Performance

The Charter School next maintains that CAB and the District erred when they determined that the Charter School failed to meet the student performance requirements. Specifically, the Charter School argues the fact that the Charter School did not make adequate yearly progress (AYP) for the 2009-2010 or 2010-2011 school years does not demonstrate that it violated the student performance standards.

Section 1729-A(a)(2) of the CSL authorizes a school district to revoke or not renew a charter based on a school's

> [f]ailure to meet the requirements for student performance set forth in 22 Pa. Code Ch. 5 (relating to curriculum) or subsequent regulations promulgated to replace 22 Pa.[]Code Ch. 5 or **failure to meet any performance standard set forth in the written charter** signed pursuant to [S]ection 1716-A.

24 P.S § 17-1729-A(a)(2) (emphasis added).

> Proficiency as measured by PSSA test scores is . . . a . . . student performance requirement. **A consistently low percentage of students scoring proficient or better on the PSSA constitutes a failure to satisfy . . . student**

18

**performance requirements and is a valid ground for non[-]renewal of a school's charter** under Section 1729–A(a)(2) of the [CSL] where the charter school's proficiency rates are lower than those of its school district's schools as a whole and no clear pattern of significant improvement in its PSSA results is shown.

*New Hope Acad. Charter Sch. v. Sch. Dist. of the City of York (New Hope Acad.)*, 89 A.3d 731, 737 (Pa. Cmwlth. 2014) (citations and footnote omitted; emphasis added). The Charter Application represented that "[a]cademic achievement will increase for all students in the areas of math, science, reading and social studies"; and its annual measurable goal was that 85% of students who attend the Charter School for five years will achieve grade level proficiency as measured by the state assessments in math, science, reading and social studies. R.R. at 615a.

Here, it is undisputed that based on 7 years of PSSA scores, the Charter School did not meet AYP for 6 of those years. Specifically CAB found: "With regard to [m]ath, [the Charter School] failed to make AYP in the past five consecutive school years . . .; [the Charter School] has only made AYP in [m]ath once since the 2005-2006 school year, in school year 2006-2007." CAB(2) Dec. at 14, FOF 62. "With regard to [r]eading, [the Charter School] failed to make AYP in the past five consecutive school years . . .; [the Charter School] has made AYP in [r]eading just once since the 2005-2006 school year, in school year[] 2006-2007." CAB(2) Dec. at 16, FOF 64.

In addition, the Charter School did not achieve its stated measurable goal that 85% of students who attend the Charter School for five years will achieve grade-level proficiency as measured by the state assessments in math, science, reading and social studies. As of 2010 (i.e., the last year before the underlying administrative hearings began), there were 41 students who attended the Charter School for five or more years. Of these students, only 46.3% were proficient or advanced in math, and only 31.7% were proficient or advanced in reading, which was less than half of the

85% annual measurable goal the Charter School set for itself in its Charter Application. *See* CAB(2) Dec. at 54. The Charter School asserts that a goal is an objective, not a mandate. However, a charter school is statutorily required to include in its charter application: its "mission and education goals, the curriculum to be offered and the methods of assessing whether students are meeting educational goals." 24 P.S. § 17-1729-A. Further, the record evidence demonstrates the Charter School's "consistently low percentage of students scoring proficient or better . . . [which] is a valid ground . . ." for revocation. *New Hope Acad.,* 89 A.3d at 737 (citing Section 1729-A(a)(2) of the CSL). Moreover, an essential CSL purpose is to "[i]mprove pupil learning." 24 P.S. § 17-1702-A. Accordingly, CAB and the District did not err when they found that the Charter School failed to meet student performance requirements.

### Disparate Treatment

The Charter School further contends that it has suffered disparate treatment because in *In Re: Sugar Valley Rural Charter School* (CAB 2004-04), CAB renewed Sugar Valley Rural Charter School's (Sugar Valley) charter even though Sugar Valley did not meet its AYP over the same time period, and failed to meet its goals. The District rejoins that the Charter School waived this argument because it did not raise it before CAB and therefore CAB did not have an opportunity to address it.

Similar to the estoppel issue, there is no indication that the disparate treatment issue was presented to CAB, and the Charter School has failed to direct us to any portion of the record that would show otherwise. Therefore, this issue has been waived. *Spotz.* Nonetheless, *Sugar Valley* is inapposite because Sugar Valley had only two years of fallen PSSA test scores, but no evidence that it failed to make AYP. Here, as stated above, there were seven years of PSSA test scores, and the

20

Charter School failed to make AYP for the past five consecutive years in math and reading. *See* CAB(2) Dec. at 14, 15.

The Charter School also declares that since CAB concluded in *Sugar Valley* that a school's inability to achieve its goal does not establish a ground for revocation, the Charter School's failure to meet its goal is not a ground for revocation. However, in *Sugar Valley*:

> The record [did] not evidence that Sugar Valley ha[d] failed to meet the applicable student performance requirement established by the State Board of Education . . . . It [did] evidence that test scores ha[d] fallen and that, if they are not improved, Sugar Valley will most likely violate the standards . . . . Until the standards are actually violated, test scores cannot be the basis of a finding that the act has been violated.

*Sugar Valley*, Slip Op. at 9. As stated by CAB in the instant case: "Therein lies the distinction that makes *Sugar Valley* inapplicable. . . . In failing to make AYP, [the Charter School] violated [s]tate standards." CAB(2) Dec. at 56. Because the Charter School is not similarly situated to Sugar Valley, the Charter School's reliance on the decision therein to support its claim is misplaced.

**Fiscal Management**

The Charter School claims that CAB and the District erred when they determined that the Charter School failed to meet generally-accepted standards of fiscal management. Section 1729-A(a)(3) of the CSL provides that a school district may revoke or not renew a charter for "[f]ailure to meet generally[-]accepted standards of fiscal management or audit requirements." 24 P.S. § 17-1729-A(a)(3). The Charter Application stated that the Charter School will comply with state child accounting procedures and "will ensure through its Student Information System that

21

enrollment figures and attendance will be reported accurately and in accordance with [the] Pennsylvania Public School Code [(School Code of 1949)]."[14]  R.R. at 652a.

However, the record evidence reveals that the Charter School provided inaccurate enrollment information as the Charter School identified four students in the roster it provided to the District and in its monthly billings as special education students, and billed the District for the increased per pupil allotment for these special education students during periods when the students were no longer classified as students with disabilities.  Consequently, the Charter School overbilled the District for these students for years, resulting in the District overpaying the Charter School $110,398.54.  The Charter School characterizes these overpayments as a "minor misreporting" and "the parties' mutual failure[.]"  Charter School First Br. at 56, 57. However, it was the Charter School's obligation to periodically update the individual education plans of special education students and provide that updated information to the District.  *See* 22 Pa. Code § 14.104(i).

Moreover, the Charter School's Charter Application stated that "[a]n annual school audit shall be conducted according to the requirements of Article 24 of the School Code of 1949.  Charter School Board of Trustees shall follow the requirement set forth for School Boards in this section."  R.R. at 651a.  In its Charter Application, the Charter School certified that it would "comply with the same Federal and State audit requirements as do other elementary and secondary schools in the State[.]"  R.R. at 670a.  The PDE issues a Manual of Accounting and Financial Reporting for Pennsylvania Public Schools, which requires, among other things, that a charter school file an annual audit with PDE no later than December 31 after the fiscal year end if the charter school expends less than $500,000 in federal funds. Nevertheless, the Charter School did not comply with this requirement for fiscal

---

[14] Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§ 1-101 - 27-2702.

years ending June 30, 2007, June 30, 2008, June 30, 2009, and June 30, 2010, the audits for which were dated May 2, 2008, October 17, 2009, and October 27, 2010, respectively. The audit for the fiscal year ending June 30, 2010, had not yet been filed as of the July 7, 2011 hearing date. There is no record evidence indicating why the Charter School filed its audits late. As CAB explained in its decision: "[T]he reason for requiring the regular filing of financial audits by a charter school is to promote accountability and to enable the chartering school district, which has oversight of the charter schools it authorizes, to identify possible financial mismanagement before it becomes a serious problem[.]" CAB(2) Dec. at 60.

The Charter School failed to meet generally-accepted standards of fiscal management through its consistent failure to provide the District with accurate enrollment data, resulting in the District overpaying the Charter School $110,398.54, and by its failure to file timely financial audits. Accordingly, CAB and the District did not err when they determined that the Charter School failed to meet generally-accepted standards of fiscal management.[15]

## Due Process

The Charter School asserts that the Board violated the Charter School's due process rights by unilaterally appointing Prendergast as the hearing officer because he previously represented the District when it attempted to revoke the Charter School's charter. In addition, the Charter School alleges that in the prosecution of the revocation/non-renewal of the Charter School's charter, Prendergast allowed the District to litigate this matter without identifying witnesses before they were called, without any notice of exhibits that would be introduced and

---

[15] This Court notes that although CAB found the enrollment data to be a violation, it did not find it to be "a material violation of such standards." CAB(2) Dec. at 58. However, CAB found the failure to file timely audits "a material [violation] and particularly when aggregated with the other violations found above, justifie[d] the termination of [the Charter School's] charter." CAB(2) Dec. at 60.

23

without any ability for the Charter School to engage in meaningful due process. Finally, the Charter School avers that the Board violated the Sunshine Act[16] by deliberating and voting on the revocation of the Charter School's charter in executive session and not in public.

In regard to Prendergast's alleged impartiality, the Charter School argues that Prendergast had a conflict of interest which should have disqualified him from hearing the matter. The Charter School asserts in its brief that "Prendergast was questioned about previous representations of the District or potential conflicts of interest and he neglected to disclose at any time he was counsel to the District during its first revocation attempt against [the Charter School]." Charter School First Br. at 63. However, there is nothing in the record to substantiate the Charter School's position that Prendergast was questioned, nor does the Charter School cite any part of the record to support that claim. Review of the record indicates that on April 19, 2011, at the beginning of the first hearing, the Charter School's counsel[17] stated: "It is also our position that there is no authority under the [CSL] with regards for [sic] a hearing officer, with all due respect Mr. Prendergast, we ask that the record reflect that we object that the proceedings go forward on that basis. That's all." R.R. at 1655a.

Notwithstanding,

> we cannot ignore the fact that local school boards have a significant interest in whether charters are granted; indeed the legislative history contains frequent references to the bias of local school boards against charter schools. Thus, . . . there is a need for a neutral fact finder at **some stage** of the proceedings – one which will consider the findings made by the local school board but which will remain free to **'disagree**[] **with those findings'** and draw its own conclusions after 'due consideration' of those findings.

---

[16] 65 Pa.C.S. §§ 701-716.
[17] Brian H. Leinhauser, Esquire.

24

*W. Chester Area Sch. Dist. v. Collegium Charter Sch.*, 760 A.2d 452, 461 (Pa. Cmwlth. 2000) (citation and footnote omitted), *aff'd*, 812 A.2d 1172 (Pa. 2002). CAB as "the ultimate fact finder" is that neutral fact finder. *Id.* Thus, any potential bias was cured when CAB reviewed the Board's revocation decision.

With respect to the Charter School's contention that it was not provided discovery before the hearing, "[a]s a general rule, discovery as provided by the rules of civil procedure [is] not available in administrative proceedings." *Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 981 A.2d 975, 997 n.18 (Pa. Cmwlth. 2009).

Further, Section 1729-A(c) of the CSL provides:

> Any notice of revocation or nonrenewal of a charter given by the local board of school directors of a school district shall state the grounds for such action with reasonable specificity and give reasonable notice to the governing board of the charter school of the date on which a public hearing concerning the revocation or nonrenewal will be held. The local board of school directors shall conduct such hearing, present evidence in support of the grounds for revocation or non[-]renewal stated in its notice and give the charter school reasonable opportunity to offer testimony before taking final action. Formal action revoking or not renewing a charter shall be taken by the local board of school directors at a public meeting pursuant to the act of July 3, 1986 (P.L. 388, No. 84), known as the 'Sunshine Act,' after the public has had thirty (30) days to provide comments to the board. . . .

24 P.S. § 17-1729-A(c). However,

> [l]ike many Commonwealth agencies, which serve as ultimate fact-finding tribunals, the [Board] has broad discretion to delegate to hearing officers the task of conducting hearings. Thus, we hold that the Board fully complied with the requirements of due process by: (1) appointing a hearing officer to hold a hearing at which [the Charter School] was represented by counsel and had the opportunity to cross-examine witnesses; (2) reviewing the officer's findings of facts, conclusions of law and recommendation; and (3) making an independent ruling based on the entire record.

25

*Lewis v. Sch. Dist. of Phila.*, 690 A.2d 814, 817 (Pa. Cmwlth. 1997) (footnote omitted). Accordingly, we conclude that the Charter School was afforded due process.

> Finally, an
>
> alleged violation of the Sunshine [Act] is not properly reviewed by this Court in this procedural posture. The courts of common pleas have original jurisdiction over open meeting challenges for local agencies.
>
> The Charter School's remedy for a Sunshine [Act] violation is statutorily limited as follows: 'a legal challenge under this chapter shall be filed *within 30 days* from the date of a meeting which is open, or within 30 days from the discovery of any action that occurred at a meeting which was not open at which this chapter was violated.' Section 713 [of the Sunshine Act] also sets a one year statute of limitations in the event a meeting was not open.

*Pocono Mountain Charter Sch., Inc. v. Pocono Mountain Sch. Dist.*, 88 A.3d 275, 286 (Pa. Cmwlth. 2014) (citations omitted). Because this Court is not the proper forum to review the alleged Sunshine Act violation, we have no jurisdiction to resolve this issue.

For all of the above reasons, CAB's June 18, 2012 order dismissing the District's motion to quash the Charter School's appeal to CAB and CAB's August 2, 2013 order affirming the decision of the Board to revoke the Charter School's charter are affirmed.

 

_____
ANNE E. COVEY, Judge

26

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Graystone Academy Charter School, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Coatesville Area School District, | : | No. 1336 C.D. 2013 |
| Respondent | : | |
| | | |
| Coatesville Area School District, | : | |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| Graystone Academy Charter School, | : | No. 1402 C.D. 2013 |
| Respondent | : | |

## O R D E R

AND NOW, this 27th day of August, 2014, the State Charter School Appeal Board's (CAB) June 18, 2012 order dismissing the Coatesville Area School District's (District) motion to quash the Graystone Academy Charter School's (Charter School) appeal to CAB, and CAB's August 2, 2013 order affirming the decision of the District's Board of Directors to revoke the Charter School's charter are affirmed.

_____
ANNE E. COVEY, Judge