Beaver County Behavioral Health,   :
                     Petitioner   :
                                        :
              v.                 :
                                          :
Department of Human Services,   :   No. 1120 C.D. 2015
                     Respondent   :   Submitted: January 15, 2016

BEFORE:   HONORABLE MARY HANNAH LEAVITT,  President Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                       FILED: August 3, 2016

Beaver County Behavioral Health (BCBH) petitions this Court for review of the Pennsylvania Department of Human Services' (the Department), Bureau of Hearings and Appeals' (BHA) June 5, 2015 order adopting the administrative law judge's (ALJ) recommendation denying BCBH's administrative appeal (Decision). The sole issue for this Court's review is whether the Department's Office of Developmental Programs (ODP) complied with rate-setting regulations in establishing its November 15, 2011 to June 30, 2012 Supports Coordination Organization (SCO) reimbursement rates.[1] After review, we affirm.

BCBH is an SCO that employs 16 support coordinators (SC) who provide supports coordination services (SCS) through ODP to 755 eligible participants with intellectual disabilities in Beaver County.

---

[1] This matter originally involved three separate appeals by SCOs to the BHA challenging the Department's fee schedule for supports coordinator services. The appeals were consolidated. The two other appellants raised additional issues not raised by BCBH. Only BCBH appealed to this Court.

The [SCs] are responsible for providing for the overall locating, coordinating and monitoring of the services that the individual is in need of. They develop their individual service plans (ISP) that the case manager is responsible for [sic] facilitating the team meetings, documenting everything in the ISP according to the regulation set forth by the Department within the time frame set forth by the Department. Those documents are then mailed out to the team members and then the [SC] is responsible for locating any services that the individual needs, coordinating those services, monitoring all the services that are put in place and also ensuring their health and safety. A[n SC] is required to have a bachelor's degree[.]

There is turnover among [SCs]. . . . When [BCBH] bring[s] in a new [SC], it takes at least 3 months for that person to become fully productive.

Even an experienced [SC] receives 40 hours of training per year. New employees require additional training [i]n order to understand and do their job. This training is not mandated by the Department.

[SC] services are funded by the [Department]. The payment is based on a billable rate established by the Department times the number of billable units of service provided. There are no other purchasers of [SC] services for the intellectually disabled other than the Department.

Reproduced Record (R.R.) at 300a, Stipulation of Facts.

ODP administers and oversees the Consolidated Waiver and Person/Family-Directed Support (P/FDS) waiver (Waivers) programs. "The consolidated and P/FDS waivers are home and community[-]based waivers . . . approved by the [United States (U.S.)] Department of Health and Human Services, Centers for Medicare and Medicaid Services ('CMS') under Section 1915(c) of the Social Security Act, 42 U.S.C. § 1396n(c)." Decision, Finding of Fact (FOF) ¶ 9. BCBH provides SC services under the Waivers programs. *Id*. ¶ 10. "To become a Waiver provider, a qualified provider must meet certain qualifications, enroll in the

Promise billing system, register with the Home and Community Services Information System . . . and be willing to provide the services and sign a provider agreement. [BCBH] signed [an agreement] for fiscal year (FY) 2011-2012." Decision, FOF ¶ 11.

Before July 1, 2009, SCOs contracted directly with and were paid directly by counties for services provided. "Effective July 1, 2009, the Prospective Payment System (PPS) used historical data reported in cost reports for services delivered to Waiver participants as the base data to develop prospective payment rates for certain Waiver services in order to comply with CMS requirements regarding waivers." *Id*. ¶ 15. For FYs 2009-2010 and 2010-2011, ODP used provider-submitted historical expense data to develop payment rates. In September 2010, ODP announced that effective for FY 2011-2012, SC service rates would be based upon a fee schedule.

By October 4, 2011 letter, ODP informed BCBH that rate setting for the period between July 1, 2011 and November 14, 2011, would be as follows:

> Contrary to ODP's intent when it requested SC providers submit cost reports to support the rate-setting process for FY 2010-2011, the payment rates were not developed from the cost report data submitted by SC providers in October 2009. Providers reported several difficulties in completing their cost report(s), including identifying units, allocating administration expenses and allocating staff time between waiver SC services and Targeted Services Management. ODP determined it was not possible to use the data to develop FY 2010-2011 payment rates because the reported difficulties undermined the reliability and accuracy of the cost report data. For example, analysis of the FY 2008-2009 data in the approved cost reports showed unit costs ranging from $10.67 to $45.08 and extreme rate changes for many individual providers, ranging from rate increases of 70% to rate decreases of 40%, even after applying similar productivity adjustments as were applied in developing the FY 2009-2010 payment rates.
>
> The payment rates for FY 2010-2011 and FY 2011-2012 for the period July 1, 2011 through November 14, 2011 were

3

therefore based on each provider's FY 2009-2010 payment rate(s) instead of the FY 2008-2009 cost report data. To establish each provider's FY 2010-2011 payment rate(s), ODP first applied a cost of living increase of 0% to each FY 2009-2010 rate. ODP then projected total FY 2010-2011 waiver expenditures using the proposed payment rates and projected utilization for all waiver services and compared those projected expenditures to the adjusted budget amounts. A rate adjustment factor (RAF) of -2.50% was applied to the adjusted unit costs for all waiver services except fee schedule, outcome-based and vendor services, so that the estimated waiver expenditures would not exceed the available waiver appropriation.

R.R. at 15a. The letter further notified BCBH that, "[e]ffective November 15, 2011, SC services will be paid using the Medical Assistance Program Fee Schedule rates that will be located on the [Department's] web site." R.R. at 14a.

On November 15, 2011, ODP began reimbursing SCOs in accordance with a fee schedule rate. The fee schedule rate for SC services was developed by a workgroup (Workgroup). In developing the fee schedule, the Workgroup used a market-based approach, identified cost components and then reviewed "staff salaries; titles; wages; employee-related expenses; reviewed an independent data source for salary for positions necessary to staff SCS; U[.]S[.] Department of Labor Statistics; Economic Research Institute information; a survey that Mercer Human Resources conducted; training; travel; direct and non-direct non-salary costs; and indirect costs administration and overhead costs." Decision, FOF ¶¶ 27-28. The Workgroup calculated its rate for SCS based on the following assumptions:

a. Wages and salaries;

b. Hours worked;

c. Employee[-]related expenses for the SC, supervisor, assistant director and director;

d. Staffing for supervisors, assistant directors and directors;

> e.  Additional monies to cover more than the ODP required forty (40) hours of training;
>
> f.  Direct non-salary costs including reimbursement for mileage using the state's rate of reimbursement;
>
> g.  Assigned 58.4% productivity factor;
>
> h.  Adjusted for the four (4) geographical areas based on the Pennsylvania Department of Labor wage dat[a] for certain direct care positions and on population.

*Id*. ¶ 29.  ODP's fee schedule billed in 15-minute intervals.  For the period November 15, 2011 to June 30, 2012, ODP assigned BCBH a fee schedule rate of $19.08 per 15-minute unit.

On December 13, 2011, BCBH filed a Written Appeal and Request for Hearing with the BHA.  An ALJ conducted a hearing on June 11, 2013.  At the hearing, BCBH presented the testimony of Carl Herbein (Herbein), President and CEO of Herbein and Company, an accounting firm BCBH retained to review the modeled rates.  Herbein conducted a survey of SC providers (Herbein Survey).  The ALJ summarized the Herbein Survey results as follows:

> a. Sixty-one (61) SCOs received, via mail or email, the survey;
>
> b. Twenty-six (26) of sixty-one (61), or forty-three (43) percent of the SCOs responded to the survey;
>
> c.  Different categories of SCO[s] from different geographical regions/zones responded to the survey;
>
> d. The Respondents of the survey represented forty-four (44) percent of the units of service SCOs billed;
>
> e. The Respondents represented an adequate and usable cross section of SCOs in PA for the time period for purposes of analyzing the questions and results sought;
>
> f. Responses in the range of 1/6 to 1/3 of Respondents is, not unusual for accounting survey purposes;

g. Herbein summarized the survey results and created a spreadsheet;

h. If responses were unclear, Herbein asked questions of the SCOs;

i. Herbein arrived at a weighted average to determine hours worked for a full-time SC, taking into account lunch and other breaks; paid time off for vacation, holidays and sick time; training; turnover; travel; and direct care billable hours;

j. Herbein determined that SCOs averaged 939 billable hours versus ODP's 1,215 billable hours;

k. Herbein determined that SCOs had an average of 1,992 total working hours;

l. Herbein calculated the productivity percentage as forty-seven (47) percent (939 billable hours /1,992 total working hours) versus ODP's 58 %;

m. ODP overstated SCOs billable hours by 29.4% (1,215 (ODP billable hours) minus 939 (SCOs billable hours) =276. 276/939 =29.4 %)[;]

n. ODP underpaid SCOs by 29.4%.

*Id*. ¶ 40 (citations omitted). The ALJ noted that "Herbein did not include definitions or a glossary with [the] survey; instructions for completion; or ask the SCOs to identify who completed the survey." *Id*. ¶ 41. "Based on the Herbein report, [BCBH] calculated the number of billable hours for the year for SCS as 939 hours." *Id*. ¶ 42. Finally, "[a]ccording to [BCBH], ODP overstated SCOs billable hours by 276 hours (1,215-939=276) or 29.4% (276/939), resulting in an underpayment in fees owed to SCOs as [the] recommended rate was too low." *Id*. ¶ 43.

Agnes Rudolph (Rudolph), Accountant and Regional Fiscal Officer for Liberty Health Care Corporation assigned to ODP and Workgroup co-chair, was called to testify by both BCBH and ODP. Rudolph described the process and methods under which the fee schedule was developed. Thereafter, the ALJ issued a

recommendation denying BCBH's appeal. By June 15, 2015 order, the BHA adopted the ALJ's recommendation in its entirety. BCBH appealed to this Court.[2]

BCBH argues that ODP violated Section 51.52 of the Department's Regulations[3] in establishing SC fees by relying on conjecture rather than actual data for the productivity component identified therein.[4] Section 51.52 of the Department's Regulations provides:

> (a) Fee schedule rates are established using the following methodology:
>
> > (1) **Market-based approach using the following cost considerations**:
> >
> > > (i) Wages for staff.
> > >
> > > (ii) Staff-related expenses.
> > >
> > > (iii) **Productivity**.
> > >
> > > > (A) Indirect program expenses.
> > > >
> > > > (B) Administration-related expenses.
> > > >
> > > > (C) Geographical cost considerations.
> >
> > (2) Review of approved [Home and Community-Based Services ([]HCBS[)] definitions and determinations made about cost components which reflect costs that are necessary and related to the delivery of each HCBS.
> >
> > (3) **Use of independent data sources such as the Pennsylvania-specific compensation study and data from previously[-]approved cost reports, as applicable.**

---

[2] "Our scope of review in an appeal of an adjudication of the [BHA] is limited to whether constitutional rights were violated, whether an error of law occurred, or whether essential findings of fact are supported by substantial evidence." *Grane Hospice Care, Inc. v. Dep't of Pub. Welfare* 74 A.3d 1094, 1098 n.4 (Pa. Cmwlth. 2013).

[3] 55 Pa. Code § 51.52 (describes the ODC fee schedule rate process).

[4] *See* 55 Pa. Code § 51.52(a)(1)(iii).

7

(b) The Department will pay for fee schedule services at the rate determined by the Department.

(c) The Department will update the fee schedule rates under the [Medical Assistance] Program fee schedule as a notice in the *Pennsylvania Bulletin*.

(d) Subsection (a)(1)(iii)(C) does not apply to a provider under the Adult Autism Waiver.

55 Pa. Code § 51.52 (emphasis added). Section 51.42 of the Department's Regulations defines "[*m*]*arket-based approach*" as "[a] process used to develop [medical assistance] or Department-established fees based on independent data sources[5] for a particular waiver service's cost components, including the consideration of reasonable and necessary costs for the delivery of a waiver service." 55 Pa. Code § 51.42.

BCBH asserts that, although ODP collected independent data pertaining to wages for staff, indirect program expenses, administration-related expenses, and geographical cost considerations, it collected no productivity data. Thus, BCBH maintains ODP violated Section 51.52 of the Department's Regulations by making unsupported assumptions and failing to consider relevant factors where "the non-data-based process ODP used resulted in a productivity factor that has little or no relationship to the reality of the most relevant market – Pennsylvania SCOs." BCBH Br. at 17. BCBH acknowledges that "[t]he regulation provides little guidance as to what is meant by a market-based approach. However, at the least, the methodology seems to require collection of data." BCBH Br. at 16. BCBH reasons that, based on the process ODP used, "ODP failed to follow the requirements of its [R]egulation regarding [the] use [of] independent data or approved cost reports to develop a fee schedule." BCBH Br. at 19.

---

[5] The Department's Regulations do not define the term "independent data sources."

8

In response, the Department contends that Section 51.52 of the Department's Regulations does not mandate particular data sources to be used, the number of data sources, or the manner in which they must be used. The Department asserts:

> ODP used independent data to determine the productivity factor it used to establish the fee schedule rate for [SC] services for the period of November 15, 2011 to June 30, 2012. When ODP calculated the productivity factor, it used 2,080 hours a year as the potential number of hours a[n SC] could work because that is the number of hours used by the Bureau of Labor and Statistics to convert annual wages into hourly rates. In addition, ODP's [sic] used thirty days of paid time off because that is the number of paid time off days ODP used for other services for which ODP calculated a fee schedule rate. ODP also included forty hours a year for training because this is the amount of training required by ODP. Finally, ODP chose eleven hours of travel time after examining the type of travel that support coordinators must do in both rural and city areas.

> Moreover, [BCBH's] reliance on the survey of [SCOs] conducted by [Herbein] as support for its claim that ODP's process resulted in a miscalculation of the productivity rate is misplaced. There simply is no requirement that ODP use the data that [Herbein] relied on to reach his conclusions. . . . In fact, ODP could not use such data because [the information collected by Herbein did not constitute independent data].

Department Br. at 12-13 (citations omitted).

"This Court defers to an agency's expertise and gives the agency's interpretation of its regulations great weight unless it is plainly erroneous or inconsistent with the regulations. Statutory and regulatory interpretations should be accorded great deference." *D'Alonzo v. State Real Estate Comm'n*, 702 A.2d 1102, 1104-05 (Pa. Cmwlth. 1997) (citation omitted); *see also Graystone Acad. Charter*

*Sch. v. Coatesville Area Sch. Dist.*, 99 A.3d 125 (Pa. Cmwlth. 2014); *Eastwood Nursing & Rehab. Ctr. v. Dep't of Pub. Welfare*,[6] 910 A.2d 134 (Pa. Cmwlth. 2006).

> The task of the reviewing court is limited to determining whether the agency's interpretation is consistent with the regulation and with the statute under which the regulation was promulgated. The [U.S.] Supreme Court has referred to this deference as the interpretive lawmaking power of administrative agencies and has characterized it as a 'necessary adjunct' of the authority to promulgate and enforce regulations. *Martin v. Occupational Safety [&] Health Review Comm[′n]*, 499 U.S. 144, 152 . . . (1991).

*Dep't of Envtl. Prot. v. N. Am. Refractories Co.*, 791 A.2d 461, 464-65 (Pa. Cmwlth. 2002) (citations omitted). Further, "[w]hen the fact finder has determined the weight and the credibility of evidence, this [C]ourt will not disturb such determinations on review." *Bucks Cnty. Children & Youth Soc. Servs. Agency v. Dep't of Pub. Welfare*, 977 A.2d 1254, 1256 (Pa. Cmwlth. 2009).

In her Decision, the ALJ recommended and, by adopting the ALJ's recommendation, the BHA concluded:

> ODP complied with. . . [Section 51.52 of the Department's Regulations,] when it established fee schedule rates for FY 2011-2012. ODP utilized a market-based approach that considered productivity which is required by [Section 51.52 of the Department's Regulations]. [Rudolph] testified in great detail about the considerations the Department examined to arrive at its productivity assumption, including wages; staff[-]related expenses; productivity; definitions and determinations made about cost components that reflect costs necessary and related to the delivery of the services; and independent data sources noted in [FOF] numbers 27 and 29. (N.T. 105-124, 210-212). On the contrary, [BCBH] rel[ies] on the Herbein [S]urvey as proof that the established fee schedule rates for FY 2011-2012 were about '29.4%' less than what is justified by the facts. (N.T. 161, 163).

---

[6] The Department of Human Services was formerly the Department of Public Welfare.

10

The Herbein [S]urvey fails to recognize that there is no requirement that ODP conduct a survey to justify its productivity assumption in establishing its fee schedule rates. Further [Section 51.52(a)(3) of the Department's Regulations] mandates the 'use of independent data sources.' 55 Pa. Code § [51.]52[(a)](3). The Herbein [S]urvey consistently makes reference to the data it collected in its survey of 26 existing SCOs - this does not represent an independent data source.[7] Furthermore,

---

[7] Neither the ALJ in her recommendation nor the BHA in its June 5, 2015 order specifically explain the BHA's rationale for concluding that the Herbein Survey did not constitute an independent data source. However, BCBH declared in its brief that "[a]lso pending in BHA, before a different [ALJ], were appeals filed by three other SCOs raising the same issues as this appeal. Those appeals were . . . consolidated for hearing. . . . The decision [in those matters] . . . also denied the appeals." BCBH Br. at 5 n.2. BCBH attached that decision to its brief as Appendix B: *In the Appeals of Lancaster, York/Adams and Centre Cnty. Mental Health/Mental Retardation offices* (Docket Nos. 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, 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, and 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), which the BHA adopted on September 21, 2015. In that matter, the SCOs also relied on the Herbein Survey. In its decision in that case, the BHA further explained its regulatory interpretation:

> The [a]ppellants failed to demonstrate that the Department should have surveyed SCOs or used actual SCO data to calculate SCO productivity rates when calculating the new fee schedule. Per Section 51.52 [of the Department's Regulations], ODP was required to use a market-based approach to calculate the new SCO fee schedule for Waiver reimbursements for staff wages, staff-related expenses, and productivity effective November 15, 2011. 55 Pa. Code § 51.52. This meant that ODP was prohibited from using actual SCO expenses and needed to rely upon other sources of data for the calculations. The wisdom of this methodology may be debated as it forced ODP to look to non-SCO sources, such as the U.S. Department of Labor and an education setting to gather data and make productivity assumptions. It also provided little guidance for ODP in applying the market-based [approach] to create the new fee schedule. ODP gathered education, salary, benefit, training, and other work environment data from a school setting that it found similar to SCO providers to base its fee schedule calculations and productivity assumptions. As CMS approved the implementation of the PPS, ODP had broad discretion to develop and implement the fee schedule for Waiver providers. *Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 533 (3d Cir. 2002), 42 U.S.C. § 1396a, 42 U.S.C. § 1396b. Contrary to the concern of the [a]ppellants, the Department cannot dictate all the terms of the provider contracts or ignore the basic supply side

pursuant to [Section 51.52 of the Department's Regulations,] the Department will pay for fee schedule services at the rate determined by the Department. Therefore, I am able to find that ODP complied with the regulations when it established the fee schedule rate for SCS.

Decision, Analysis at I.

Section 51.52 of the Department's Regulations requires ODP use a "[m]arket-based approach." *Id.* A market-based approach is "[a] process used to develop [medical assistance] or Department-established fees based on independent data sources for a particular waiver service's cost components, including the consideration of reasonable and necessary costs for the delivery of a waiver service." 55 Pa. Code § 51.42. In accordance with Section 51.52(a)(1)(iii) of the Department's Regulations, ODP considered "indirect program expenses," "[a]dministration-related expenses" and "[g]eographical cost considerations." *Id.*; *see* Decision, FOF ¶¶ 27, 29. Pursuant to Section 51.52(a)(3) of the Department's Regulations, ODP "[u]se[d] . . . independent data sources such as the Pennsylvania-specific compensation study and data from previously approved cost reports," as described in the Decision. 55 Pa. Code § 51.52(a)(3). Our Supreme Court has opined:

economics. The Department must compensate Waiver providers sufficiently for them to remain providers or it will deprive Waiver recipients of adequate access to providers as required by 42 U.S.C. § 1396a(a)(30)(A). This means that while the Department must balance the need for adequate services being available with ensuring that taxpayers get the most for the funds expended. The ODP used a rational basis considering data from the U.S. Department of Labor, Mercer Report, and what it found to be a similarly situated employer to create a fee schedule. This was done in accordance with Section 51.52's requirement to use a market-based approach rather than actual SCO expenses. Accordingly, the [a]ppellants failed to demonstrate that the Department should have used actual SCO expenses data when calculating the new fee schedule. 55 Pa. Code § 51.52.

BCBH Br. App. B at 13-14.

12

> Appreciating the competence and knowledge an agency possesses in its relevant field, . . . an appellate court 'will not lightly substitute its judgment for that of a body selected for its expertise whose experience and expertise make it better qualified than a court of law to weigh facts within its field.' *Borough of Ellwood City* [*v. Pa. Labor Relations Bd.*]*,* 998 A.2d [589,] 594 [(Pa. 2010)].

*Lancaster Cnty. v. Pa. Labor Relations Bd.*, 94 A.3d 979, 986 (Pa. 2014). The BHA, in adopting the ALJ's finding, deemed both Rudolph's and Herbein's testimony credible. However, given the Department's interpretation of its Regulations, the BHA, as it was free to do, clearly assigned more weight to Rudolph's testimony, evidencing the "considerations the Department examined to arrive at its productivity assumption[.]" Decision, Analysis at I. This Court will not disturb weight and credibility determinations on review. *Bucks Cnty.* Accordingly, we hold that ODP complied with rate-setting regulations in establishing its November 15, 2011 to June 30, 2012 SCO reimbursement rates.

For all of the above reasons, the BHA's order is affirmed.

_____
ANNE E. COVEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Beaver County Behavioral Health,     :
              Petitioner     :
                             :
            v.                :
                             :
Department of Human Services,     :     No. 1120 C.D. 2015
              Respondent     :

## O R D E R

AND NOW, this 3rd day of August, 2016, the Pennsylvania Department of Human Services', Bureau of Hearings and Appeals' June 5, 2015 order is affirmed.

_____
ANNE E. COVEY, Judge